IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


ERIC EUGENE ATKISSON                                                                PLAINTIFF

         v.                                  Civil No. 14-5040

DR. SCOTT LAFFERTY;
NURSE DARLA WATSON;
and SHERIFF CRADDUCK                                                         DEFENDANTS

## <u>REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE</u>

        This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  The

Plaintiff is proceeding *pro se* and *in forma pauperis.*

        The Plaintiff is currently incarcerated in the Cummins Unit of the Arkansas Department

of Correction (ADC).  The events that are the subject of this case occurred while Plaintiff was

incarcerated in the Benton County Detention Center (BCDC).  Plaintiff maintains his

constitutional rights were violated when Defendants exhibited deliberate indifference to his

serious medical needs.  Specifically, he contends Defendants were deliberately indifferent to his

need for treatment of an injury to his left pinky finger and his need for anxiety medication.

        The Defendants have filed a Motion for Summary Judgment (Doc. 31).   The Plaintiff

requested the Court's assistance in responding to the motion by preparation of a questionnaire.

The questionnaire was prepared and sent to the Plaintiff (Doc. 39).  The Plaintiff has filed his

Response (Doc. 46).  At the request of the Court, the Defendants filed a supplement (Doc. 47)

containing more legible copies of certain pages of their exhibit B-1 and an additional page of

Plaintiff's deposition that was referred to in their brief but not provided to the Court.  The

Motion is ready for decision.

-1-

## 1. Background

Plaintiff was booked into the BCDC on September 11, 2013. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) A at 6.[1] He remained incarcerated there until May 15, 2014. *Id.* at 6-7.

On November 4, 2013, Plaintiff testified he woke up having a panic attack and jumped off of his top bunk. *Plaintiff's Response* (hereinafter *Resp.*) at ¶ 3; *Defts' Ex.* A at 9. He almost stepped on another inmate. *Defts' Ex.* A at 9. When he went to catch himself, Plaintiff testified he tore the ligaments of his left hand. *Id.* Specifically, he hit his left "pinky" finger on the table hyper-extending it. *Id.* He immediately felt pain. *Id.*

The injury occurred just prior to medication call. *Resp.* at ¶ 4. Plaintiff went out to get his medication and reported the injury to Nurse Sara. *Id.* at ¶ 5. According to Plaintiff, she noticed swelling and told the Plaintiff to complete a sick call request. *Id.* at ¶ 6. Plaintiff believed he should have been sent to the emergency room. *Defts' Ex.* A at 13.

Plaintiff submitted his first written medical request via the kiosk system on November 15, 2013. *Defts' Ex.* B-1 at 11. He asked to be put on the next nurse call. *Id.* Prior to November 15th, Plaintiff maintains he made multiple verbal requests to medical staff and jail deputies starting on November 4th. *Resp.* at ¶¶ 8-9.

Plaintiff was seen by Nurse Watson on November 20th. *Resp.* at ¶ 10. Nurse Watson called Dr. Lafferty, who ordered an x-ray of Plaintiff's left hand. *Id.* at ¶ 11. Plaintiff believed an MRI should have been ordered and not an x-ray. *Id.* at ¶ 12. His belief was based on knowledge he acquired when he injured his right hand. *Id.* at ¶ 13. He indicated that an MRI

---

[1] This exhibit contains portions of Plaintiff's deposition. Reference is made to the deposition page numbers and not the document numbers.

AO72A
(Rev. 8/82)

was necessary to determine if there were any soft tissue injuries. *Id.* Plaintiff testified he knew his finger was not broken. *Defts' Ex.* A at 18.

Plaintiff was prescribed Ibuprofen, 600 mg to be taken three times a day for two weeks. *Resp.* at ¶ 14. Plaintiff requested pain medication and a splint. *Defts' Ex.* A at 17-18. He was also prescribed Klonopin (Clonazepam) for anxiety.[2] *Defts' Ex.* B-1 at 4; *Resp.* at ¶ 55.

On November 21st, Plaintiff was taken to Mercy Hospital and the x-ray was taken. *Resp.* at ¶ 15. The x-ray did not reveal any fracture or dislocation of his left hand. *Defts' Ex.* B at 3.

On November 26th, Plaintiff was informed that his x-rays were negative and that there were no broken bones. *Resp.* at ¶ 17. That same day, Plaintiff submitted a medical request via the kiosk system because his finger still hurt. *Id.* at ¶ 18. Plaintiff was not seen at the next nurse's call. *Id.* at ¶ 20. He does not know why he was not seen. *Id.* at ¶ 21.

On December 2nd, Plaintiff submitted another medical request saying that if he had missed the last nurse's call he asked to be put on doctor call. *Resp.* at ¶ 20. In response, Plaintiff was placed on the doctor's call list for December 12th. *Defts. Ex.* B-1 at 1. Plaintiff was in court and missed doctor call. *Defts' Ex.* A at 32; *Resp.* at ¶ 25.

On December 5th, Dr. Lafferty prescribed Meloxicam 15 mg. for tenderness and swelling. *Resp.* at ¶ 23. However, Plaintiff states he had not been seen by Dr. Lafferty. *Id.* According to Plaintiff, the Meloxicam did not help with the pain in his finger. *Id.* at ¶ 24.

---

[2] This medication is used to control seizures and to relieve panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html (accessed 2/17/2015)

On December 17th, Plaintiff was seen by Dr. Lafferty. *Resp.* at ¶ 26.  Dr. Lafferty referred Plaintiff to a specialist and "buddy tape" was placed on his left 4th and 5th fingers. *Id* Plaintiff was also prescribed Celexa 20 mg.[3]

On December 20th, Plaintiff refused to take the Meloxicam any longer and asked to see Dr. Lafferty. *Resp.* at ¶ 27.  Plaintiff believed the medication had increased his pain and, as a side effect, caused him urinary problems. *Id.* at ¶ 28.

On January 10, 2014, Plaintiff was seen at Ozark Orthopedics by Dr. Robert Bryan Benafield, Jr. *Defts' Ex.* A at 20; *Resp.* at ¶ 29; *Plff's Ex.* K.  Dr. Benafield did not do an MRI or any other medical tests. *Defts' Ex.* A at 20.  However, Dr. Benafield did a physical examination and orally questioned the Plaintiff. *Defts' Ex.* A at 21; *Resp.* at ¶ 30.  According to Plaintiff, Dr. Benafield said he would need surgery to correct the mobility in his hand. *Resp.* at ¶ 32.

According to Dr. Benafield's clinical notes of January 10th, Plaintiff had an "injury to your right index finger[4] that occurred in October[5] . . . a probable flexor digitorum profundus avulsion, right hand." *Resp.* at ¶ 34; *Defts' Ex.* B-1 at 6.  Dr. Benafield testified that the tendon that goes out to the tip of the finger had pulled off the bone leaving Plaintiff unable to flex that finger. *Plff's Ex.* K at 6.  He testified that "if you're able to operate on it within a few weeks, you --often you can repair that tendon right back to the bone.  But after a month or so, that becomes impossible and you have to do a two-stage tendon graft procedure." *Id.* at 7.

---

[3]This medication is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (accessed 2/17/2015).

[4]This is in error.  It was the Plaintiff's left pinky finger that was at issue. *Resp.* at ¶ 38; *Plff's Ex.* K. at 5.

[5]This is in error.  The injury occurred on November 4, 2013. *Resp.* at ¶ 37.

-4-

When asked if he would classify the surgery as necessary or elective, Dr. Benafield testified that it would be "semi elective" because the "underlying condition is not life-threatening." *Plff's Ex.* K at 8.  However, he stated that the condition could certainly lead to the Plaintiff having decreased function in his hand. *Id.*  Dr. Benafield testified that since you are missing a tendon it can also lead to deformities which is the reason this would not be considered purely an elective procedure. *Id.* at 9.

In his clinical notes, Dr. Benafield stated that he was not sure the treatment was possible in an incarcerated setting and that there was also an issue of coverage and payment. *Defts' Ex.* B-1 at 6.  Dr. Benafield testified that he made this statement because the intensive rehabilitation needed usually consisted of outpatient physical therapy two or three times a week sometimes for several months. *Plff's Ex.* K at 10.  He didn't know if this was a possibility due to Plaintiff's incarceration. *Id.*  Plaintiff was released to be seen on an as-needed basis if he wanted to pursue treatment. *Defts' Ex.* B-1 at 6.

Dr. Benafield testified he did not hear back from the Plaintiff. *Plff's Ex.* K at 11.  Plaintiff states he requested to see Dr. Benafield again on February 3, 2014, but no appointment was made. *Resp.* at ¶ 42.

Plaintiff informed officials of the ADC of his hand injury when he was transferred. *Resp.* at ¶ 40.  When he was transferred, Plaintiff did not ask to have the surgery done at the ADC until he figured out what was going on with his "lawsuit or whatever." *Defts' Ex.* A at 23-24; *Resp.* at ¶ 41.  Plaintiff states that Dr. Warren at the ADC refused to do anything about the injury except prescribe one arm duty for the Plaintiff. *Resp.* at ¶ 43; *Plff's Ex.* L.  Plaintiff works on

AO72A
(Rev. 8/82)

the "hoe squad" picking vegetables at the ADC.  *Resp.* at ¶ 44.  The work does not require the use of Plaintiff's left hand or arm.  *Id.* at ¶ 45.

Plaintiff has not had surgery to correct the injury to his left pinky finger.  *Resp.* at ¶ 42. Plaintiff still has a burning sensation and shooting pains every time he tries to close his hand. *Id.* at ¶ 46.  He testified that he cannot grip anything with his last two fingers.  *Defts' Ex.* A at 25.  He does not know what caused the stiffness in the second finger.  *Id.*  He has a prescription for Indomethacin 50 mg., twice a day.[6]  *Resp.* at ¶ 47.

With respect to his anxiety disorder, Plaintiff maintains Dr. Lafferty initially refused to provide the Plaintiff with his anxiety medication and when he did prescribe it he did not provide the dosage prescribed by Dr. Natalie Bush Strode at the ASH.  *Defts' Ex.* A at 36-37; *Resp.* at ¶ 50.  Dr. Strode prescribed two milligram of Klonopin, two times a day.  *Defts' Ex.* A at 37; *Plff's Ex.* A at 3.  Dr. Lafferty prescribed one milligram twice a day.  *Defts' Ex.* A at 36; *Resp.* at ¶ 52.  Plaintiff testified he had never had a panic attack when he received the correct dosage. *Defts' Ex.* A at 66.

Plaintiff submitted requests on September 12, 2013, and September 19, 2013, for his prior medication that he had been given by Dr. Strode.  *Resp.* at ¶ 51.  Plaintiff states the Defendants received his medical records showing the diagnosis of anxiety disorder and the prescribed treatment on September 19, 2013, but did nothing.  *Resp.* at ¶ 34; *Plff's Ex.* A.  The records show he was discharged from the ASH on the following medications: Klonopin

---

[6]This medication is used to relieve moderate to severe pain, tenderness, swelling, and stiffness. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681027.html (accessed 2/17/2015).

(Clonazepam) 2 mg., twice a day, Venlafaxine[7] 75 mg. twice a day, and Trazodone[8] 300 mg. at night. *Plff's Ex.* A at 3. Dr. Lafferty prescribed Trazodone300 mg. at night and Venlafaxine 75 mg. twice a day. *Plff's Ex.* F.

Plaintiff asserts the Defendants discontinued his prescription for Klonopin and he believes this is brought about the panic attack that resulted in his November 4th injury to his hand. *Resp.* at ¶ 35. On November 20, 2013, he was prescribed one milligram of Klonopin, twice a day. *Resp.* at ¶ 54. On January 6, 2014, Plaintiff submitted a grievance stating that his "psych doctor ordered 2 mg klonopin not 1 mg." *Id.* at ¶ 55. In response, he was told that Dr. Lafferty ordered one milligram and didn't want to change it at that time. *Id.* at ¶ 56.

Plaintiff was asked whether he contended a policy, custom, or practice of Benton County resulted in his being deprived of his federal constitutional rights. He responded affirmatively and stated:

> As a pre-trial detainee I was to be provided the same level of care due to patients in private practice. The practices and policies of the BCDC and medical department at the BCDC allow Dr. Lafferty to discontinue all the medical care patients receive prior to arrest and continue to deny pre-trial detainees their right to medical treatment until an injury does occur. Those practices and policies allow Dr. Lafferty and Nurse Watson the freedom to deny me medical treatment on a level consistent to someone [patients] in [a] private [setting].

*Resp.* at ¶ 62.

---

[7]This medication is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694020.html (accessed 2/17/2015).

[8]This medication is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (accessed 2/17/2015).

AO72A
(Rev. 8/82)

Plaintiff also objects to the fact that Dr. Lafferty handles all issues whether or not they deal with mental health or physical illnesses and is free to override the determination of a psychiatrist. *Resp.* at 34-35.

Dr. Lafferty writes all prescriptions at the jail. *Plff's Ex.* C at 1. As a medical doctor, Dr. Lafferty states he can diagnose and treat mental health conditions. *Id.* According to Dr. Lafferty, family medical doctors treat most psychiatric conditions in society. *Id.* Dr. Lafferty does not see all patients for whom he prescribes medication. *Id.* He relies on nurse's assessments, diagnostic tests, and other information. *Id.* Further, if a patient has a documented medical history with a prescription, Dr. Lafferty states he will continue the medication if it is one he deems medically necessary. *Id.* He indicated he will prescribe the same types of psychiatric medications as the ASH when medically necessary. *Id.* at 3. Dr. Lafferty believes that Plaintiff's anxiety would be controlled under 1 mg. of Klonopin. *Id.* at 4.

According to Sheriff Cradduck, the jail does not have a psychiatrist on staff and "[t]reatment by a psychiatrist in this community is an extremely limited resource. [However,] [m]ental health referrals are available and utilized." *Plff's Ex.* E at 3. Sheriff Cradduck stated that Dr. Lafferty makes the medical decisions with respect to all his prisoner patients. *Id.* at 4. Sheriff Cradduck does not interfere unless he has "actual knowledge that Dr. Lafferty was disregarding a serious medical need." *Id.*

## 2.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any

-8-

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3.  Discussion

Defendants argue they are entitled to summary judgment on the following grounds: (1) Plaintiff has not pointed to any County policy, custom, or practice, that operated to deprive him of his federal constitutional rights and they are entitled to summary judgment on the official capacity claims; (2) there is no evidence of deliberate indifference on the part of Dr. Lafferty or Nurse Watson; (3) Sheriff Cradduck had no personal involvement in Plaintiff's medical care and there is no basis on which to hold him liable; (4) the Defendants are entitled to qualified immunity on the individual capacity claims.

Plaintiff believes the Defendants should have taken him to the hospital when he initially injured his finger or at least stabilized it. *Defts' Ex.* A at 58.  Plaintiff believes emergency treatment might have avoided the need for extensive surgeries. *Id.*  He also believes that he

should have been prescribed the right medication for anxiety so he would not have had panic

attacks.  *Id.*  Plaintiff testified he notified Sheriff Cradduck about the problems he was having

with his medical care through a letter.  *Defts' Ex.* A at 67.

"[W]hen the State takes a person into its custody and holds him there against his will, the

Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

and general well-being."  *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation

omitted).  "Deliberate indifference to an inmate's serious medical needs violates the Eighth

Amendment as applied to the States by the Fourteenth Amendment."  *Hartsfield v. Colburn*, 491

F.3d 394, 396 (8th Cir.  2007).  In this circuit it is now settled law that deliberate indifference

is the appropriate standard of culpability for all claims that detention center officials have denied

inmates, whether in pretrial or convicted status, adequate medical care.  *See Butler v. Fletcher*,

465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs."  *Estelle  v. Gamble*, 429

U.S. 97, 106 (1976).  The deliberate indifference standard includes "both an objective and a

subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively

serious medical needs and (2) that the prison officials actually knew of but deliberately

disregarded those needs.'"  *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir 2000)(*quoting*

*Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).

"Deliberate indifference entails a level of culpability equal to the criminal law definition

of recklessness, that is, a prison official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the

-10-

inference." *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004)(internal quotation marks and citation omitted).  Medical malpractice is not deliberate indifference.  *Estelle*, 429 U.S. at 106.  However, "[d]eliberate indifference may be found where medical care is so inappropriate as to evidence intentional maltreatment." *Fourte v. Faulkner County, Ark.*, 746 F.3d 384, 387 (8th Cir. 2014)(internal quotation marks and citation omitted).

While detainees have the right to "reasonable medical care in the face of a known substantial risk of harm," *Farmer v. Brennan*, 511 U.S. 825, 847 (1994), the "Eighth Amendment does not guarantee all prisoners medical care commensurate with that enjoyed by civilian populations." *Hines v. Anderson*, 547 F.3d 915, 922 (8th Cir. 2008).  It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir. 2010) (internal quotation marks and citations omitted).  An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Id.*  Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference.  *See Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

**(A).  Delay in Care**

Here, Plaintiff contends he should have been immediately sent to the emergency room to determine the extent of injury to his finger.  He contends the delay in his getting care, in

-11-

referring him to an orthopedic specialist, and in failing to provide the surgery has resulted in unneeded pain and the loss of function in his finger.

Deliberate indifference may be manifested by jail staff "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05. However, the "Constitution does not require [jail staff] to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.,* 557 F.3d 628, 633 (8th Cir. 2009). The objective seriousness of delay in treatment must be measured by reference to the effect of delay, which must be shown by verifying medical evidence in the record. *Laughlin v. Schriro,* 430 F.3d 927, 929 (8th Cir. 2005). Unless, the need for medical attention is obvious to a layperson in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub v. VonWald,* 638 F.3d 905, 919 (8th Cir. 2011) (*citing Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999); *Aswegan v. Henry,* 49 F.3d 461, 464 (8th Cir. 1995)); *see also Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) ("noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation").

At best, the record establishes an error in judgment on the part of Nurse Watson and Dr. Lafferty. The injury occurred on November 4th, Plaintiff was specifically advised by Nurse Sara to put in a sick call request. Instead of doing that, Plaintiff continued to make verbal requests for help until on November 15th, when he submitted his first written request via the kiosk system. He was seen five days later and an x-ray was ordered and he was prescribed Ibuprofen for pain. Five days after that Plaintiff was advised that the x-ray showed no broken bones. When he continued to complain of pain, on December 5th he was prescribed Meloxicam. When

-12-

he complained the medication was not helping, he was seen by Dr. Lafferty on the 17th.  His finger was buddy taped to the next finder and he was referred to Dr. Benafield.

While Dr. Benafield testified that surgical intervention was necessary to return function to the pinky finger, the surgery was not, and is not at this point, a medical emergency or even a medical necessity.  *See Green v. Manning*, 692 F. Supp. 1283 (S.D. Ala. 1987)(no deprivation of constitutional rights where inmate's elective knee surgery was delayed).  Plaintiff has presented no evidence that the delay was detrimental to his health.  In fact, Dr. Benafield testified that the surgery will be as effective now as it would have been had it been performed in January of 2014.  I find no evidence of deliberate indifference on the part of the medical Defendants.  *See Sherrer v. Stephens*, 50 F.3d 496, 496-97 (8th Cir. 1994)(per curiam)(to show deliberate indifference, plaintiff must submit evidence that, *inter alia*, defendants ignored acute or escalating condition, given type of injury in his case).

**(B).  Medication**

Similarly, I find no evidence of deliberate indifference on the part of the medical Defendants with respect to the treatment of Plaintiff's mental health needs.  Plaintiff's records were obtained from the ASH on September 19th--eight days after he was booked in.  That same day, Plaintiff was prescribed Trazodone and Venlafaxine in the same dosages Plaintiff had been on at the ASH.  However, Dr. Lafferty did not continue the prescription for Klonopin.  Whether it was ill advised or not for Dr. Lafferty to have concluded, without having personally evaluated the Plaintiff or having consulted a mental health professional, that the Klonopin was unnecessary, the fact remains that Dr. Lafferty was the physician responsible for the care of BCDC inmates.  He exercised his professional judgment in not continuing this medication.  *See*

-13-

*Vaughn v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995)(Discontinuation of psychiatric medications amounted to a disagreement as to the course of treatment). When Plaintiff continued to complain of problems with anxiety, on November 20th, Dr. Lafferty prescribed Klonopin but in 1 mg. doses instead of the 2 mg. doses Plaintiff received at the ASH because Dr. Lafferty believed it would control the Plaintiff's anxiety. *Plff's Ex.* C. The proper dosage of medication to be prescribed is a question of medical judgment.

### (C). Sheriff Cradduck

Under section 1983, a defendant may be sued in either his individual capacity, or his official capacity, or in both. In *Gorman v. Bartch,* the Eighth Circuit Court of Appeals discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24–27, 112 S.Ct. at 361–62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25–27, 112 S.Ct. at 362.

*Gorman,* 152 F.3d 907, 914 (8th Cir.1998).

An official capacity claim against Defendants is essentially a claim against Benton County. "[R]igorous standards of culpability and causation must be applied to ensure that the [county] is not held liable solely for the actions of its employee" in cases where a plaintiff

-14-

claims a county has caused an employee to violate the plaintiff's constitutional rights. *Board of County Commissioners, Oklahoma v. Brown,* 520 U.S. 397, 405 (1997). Plaintiff has made no showing that an official policy, custom, or practice of Benton County was the moving force behind a violation of his constitutional rights. Defendants are entitled to summary judgment on the official capacity claims.

Additionally, no individual capacity claim is stated against Sheriff Cradduck. A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability. *See Monell v. Department of Social Services,* 436 U.S. 654, 694 (1978). "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes,* 21 F.3d 277, 280 (8th Cir. 1994); *see also Whitson v. Stone County Jail,* 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability") (internal quotations omitted); *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) ("general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability"). "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendants, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout,* 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri,* 442 F.3d 1128, 1132 (8th Cir. 2006)). There has been no showing that Sheriff Cradduck was involved in Plaintiff's medical care or even knew the

-15-

Plaintiff was in need of such care.   Sheriff Cradduck is entitled to summary judgment on any individual capacity claim.

### 4.  Conclusion

For the reasons stated, I recommend that the Defendants' Motion for Summary Judgment (Doc. 31) be **GRANTED and this case DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 19th day of February, 2015.


/s/ *Mark E. Ford*_____
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

-16-